UNITED STATES *v.* SCHWARTZ JEWELRY CO.

**No. 4606.**—Invoice dated Idar-Oberstein, Germany, May 10, 1938.
Certified May 11, 1938.
Entered at Buffalo, N. Y., June 2, 1938.
Entry No. 6043.

(Decided June 15, 1939)

*Webster J. Oliver*, Assistant Attorney General (*John J. McDermott* and *Dorothy C. Bennett*, special attorneys), for the plaintiff.
Defendant not represented by counsel.

CLINE, Judge: This is an appeal for a reappraisement, filed by the collector of customs at the port of Buffalo, of certain cameos and semiprecious stones imported from Wilhelm Klein & Söhne, the invoice

being dated at Idar-Oberstein, May 10, 1938, and certified by the United States consul at Cologne, Germany, on May 11, 1938.

The merchandise was entered at values in United States currency, plus packing and 2 per centum sales tax, and it was appraised at the entered value. The plaintiff introduced a copy of a report by Treasury Representative Horace A. Browne, dated October 6, 1937, from which it appears that the Treasury representative visited the Association of Precious Stone Workers in Idar-Oberstein and obtained copies of certain price lists. Those particular price lists were not identified but it is stated in the report:

Page 6 of Berlin report No. 290/36 states that the Export List for Cameos and Intaglios and List No. 2 for Cabouchons, Tigereyes, Ringstones, etc., became effective April 1, 1937, subject to the approval of the trade group in Berlin. That approval was secured and the price lists remain in force. These are the prices to American dealers whether or not members of the New York Association of Precious Stone Dealers.

These prices are not restricted to members of the New York association but are freely offered to all dealers, i. e. those who resell in the condition as imported.

It is stated in the report further that there are about 80 dealers in the United States and about 30 of these belong to the New York association; that about 80 per centum of the total sales are made to dealers and 20 per centum to American manufacturers; that the German association has agreed to sell to American manufacturers at prices 15 per centum higher than to American dealers and has raised prices to that extent for cameos and intaglios and also for cabouchons, tigereyes, ringstones, etc.; that an export price list for cameos and intaglios effective June 15, 1937, has been issued (a copy thereof being attached to Exhibit 1). It is stated further as follows:

For Cabouchons, Tigereyes, Ringstones, etc., i. e., Price List No. 2, no new list has been issued as yet, but will be issued in about one month and copies thereof when received in this office will be forwarded with report. These lists for Cameos, Intaglios, Cabouchons, Ringstones, Tigereyes, etc., are the prices to American manufacturers and are 15% higher than the prices to American dealers, as per association's agreement (both effective 6/15/37).

The terms are ex-Idar-Oberstein, packing and postage and all other costs extra, less 3% for COD or 2% for 30 days payment.

The plaintiff called John D. Wolf, the United States appraiser at the port of Buffalo, who testified that the instant shipment of semi-precious stones was the first one at these prices received at the port of Buffalo, and he reported it to the United States appraiser at New York, who sent him a report from the Treasury representative at Berlin (Exhibit 1). He compared the invoice items with the price list attached to Exhibit 1 and testified regarding values for the items on the invoice which were shown on the price list. On cross-examination he admitted that he had no information concerning the price list at the time he made his appraisement.

Leon Hayman, a partner, testified in behalf of the importing firms. He stated that the importer is a jewelry manufacturer; that in April 1937 the stone dealers association in New York tried to induce the German exporters to raise their prices to the American manufacturers so as to compel the American manufacturers either to pay a higher price to the German exporters or to purchase the stones from the dealers in the United States; that the dealers association in Germany issued a new price list whereby the American manufacturers were charged 15 per centum higher prices than was charged to the stone dealers; that the price list took effect in June 1937, but all the orders that were on hand prior to that date were shipped at the old prices; that the instant shipment was an old order which was priced on the old price list; that as far as he knew there was no importation made at the new price list; that the instructions were received before any shipments were made and he had received cables from the German exporters stating that the new prices were rescinded. On cross-examination the witness stated that he had received merchandise identical to that herein involved since the instant shipment arrived and the appraiser advised him that the price was 15 per centum higher and he increased the value accordingly upon entry, with the deduction of the 3 per centum cash discount; that he received a copy of the price list attached to Exhibit 1 in April 1937; that the purchase prices are not 15 per centum higher and he does not pay the higher prices.

Counsel for the plaintiff stated that the merchandise should be appraised on the export value and that there was no foreign value, but there is no evidence in the record upon which a finding could be based that there was no foreign value. The appellant in a reappraisement case has the burden of meeting every material issue involved in the case, citing *United States* v. *T. D. Downing Co.*, 20 C. C. P. A. 251, T. D. 46057; *Golding Bros. Co., Inc.* v. *United States*, 21 C. C. P. A. 395, T. D. 46926; *Stone & Downer Co. (Dennison Manufacturing Co.)* v. *United States*, 21 C. C. P. A. 479, T. D. 46958. In the case of *United States* v. *T. D. Downing Co.*, *supra*, the court said:

> We have had frequent occasion to endeavor to point out just what is required and upon whom the duty of proof primarily rests in appeals to reappraisement. In *United States* v. *Malhame & Co.*, 19 C. C. P. A. (Customs) 165, T. D. 45276, we discussed a number of questions relating to reappraisement procedure at considerable length and cited numerous cases in support of the rules there stated. We shall not here restate the principles of law and practice there outlined.
>
> It is sufficient here to bear in mind that the importer having appealed, it was incumbent upon it to show (1) the foreign value and (2) the export value, to the end that the higher might be taken as the dutiable value, or to show (1) a foreign value and the nonexistence of an export value, or (2) an export value and the nonexistence of a foreign value. Being the appealing party, it was incumbent upon it "to meet every material issue involved in the case." *Meadows, Wye & Co. (Inc.) et al.* v. *United States*, 17 C. C. P. A. (Customs) 36, 42, T. D. 43324.

Furthermore, the export value claimed by the plaintiff is not established. It appears from the record that a new price list, which became effective June 15, 1937, was issued by the German association which raised the prices by 15 per centum on cameos and semiprecious stones sold to jewelry manufacturers in the United States only, a cash discount of 3 per centum being allowed, and that the price list did not affect sales to dealers in the United States who resell the stones. It also appears that 80 per centum of the total sales of such goods were made by the German shippers to dealers in the United States who resell and only 20 per centum to American jewelry manufacturers. It is manifest that the major portion of the sales were made to dealers who were not affected by the new price list.

In cases where sales of merchandise have been made at different prices, the appellate court ascertained the price at which the greatest number of sales were made for the purpose of determining the *"usual wholesale quantity"* and, when the usual wholesale quantity was ascertained in that way, the price at which the greatest number of sales were made was found to be the value of the merchandise in the usual wholesale quantities and in the ordinary course of trade. In the case of *G. W. Pleissner* v. *United States,* 16 Ct. Cust. Appls. 507, T. D. 43237, the court said:

It seems quite obvious that the usual wholesale quantities, as used in this statute, should be held to refer to a major portion of the sales or offers for sale of the merchandise in question, and that sporadic sales or sales in minor quantities should not be held to constitute *usual* wholesale quantities. [Italics quoted.]

In the case of *United States* v. *Minkus*, 21 C. C. P. A. 382, at 388, T. D. 46912, the court, after reviewing many decisions on the subject, stated:

It is just as evident, however, as was held in the case of *G. W. Pleissner* v. *United States, supra,* that the Congress did intend, by the use of the word "usual", to limit the words "wholesale quantities" to such wholesale quantities as were usually, customarily, and ordinarily freely offered for sale to all purchasers in the principal markets of the country of exportation, in the ordinary course of trade; and that the language "in the usual wholesale quantities" was intended "to refer to a major portion of the sales or offers for sale," in wholesale quantities, of imported merchandise, subject, however, to the further limitation hereinbefore indicated that, although the word "quantities" must be applied in the plural, in the sense hereinbefore stated, the statute does not contemplate two or more "usual wholesale quantities" having two or more market values or prices. On the contrary, the statute does contemplate, we think, but one—*the usual*—having but one "market value" or "price * * * at which such or similar merchandise is freely offered for sale to all purchasers," at the time of exportation to the United States.

If the courts below were correct in holding, as they did, that the affidavit and the manufacturer's price list, disclosing several wholesale quantities—eight in all, each having a different market value or price—without evidence tending to establish which of the eight was the *usual*, was sufficient to establish a foreign value for the merchandise, there would be eight wholesale quantities, having

eight different market values or prices, and as many different foreign values for such merchandise, without regard to the costs of containers, coverings, and other costs, charges, and expenses "incident to placing" it in "condition, packed ready for shipment to the United States." Such a situation is, obviously, not contemplated by the statute. [Italics quoted.]

The language relating to export value in section 402 (d) of the Tariff Act of 1930 is similar to that used in connection with the definition of "foreign value" in section 402 (c) which was construed by the appellate court. Applying the same logic used by the appellate court to the evidence in this case, it must be held that if the sales to jewelry manufacturers in the United States be at a price 15 per centum higher, less the cash discount, than to dealers who resell the stones, the evidence would establish two export values unless the prices in the "usual wholesale quantities" be taken as a criterion.

According to Exhibit 1, the major portion of the sales for export to the United States was made to the dealers who resell the stones and at prices not including the 15 per centum advance. Therefore, based on the evidence and the construction of the language of the statute by the appellate court, I find that the export values of the articles in the usual wholesale quantities were the prices which the dealers who resell pay and those prices were the same as the values found by the United States appraiser. The presumption of correctness attaching to the appraisement has not been overcome by the evidence offered at the trial. Therefore, the appeal is dismissed. Judgment will be entered accordingly.